In the Matter of the Application of
CLINTON RUTLEDGE ASHFORD and
JOAN BEVERLY SCHUMM ASHFORD to register
title to real property situate at
Kainalu, Molokai, State of Hawaii.

No. 4516.

APRIL 30, 1968.

RICHARDSON, C.J., MIZUHA, MARUMOTO,
ABE AND LEVINSON, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

On August 22, 1963, Clinton R. Ashford and Joan B. S.
Ashford, the appellees, petitioned the land court to register title
to certain land situate on the Island of Molokai. The lands are
the makai (seaward) portions of Royal Patent 3004 to Kama-
kaheki and Royal Patent 3005 to Kahiko, both issued on Feb-
ruary 22, 1866.

The question before this court is the location of the makai
boundaries of both parcels of land, which are described in the
royal patents as running "ma ke kai" (along the sea). The ap-
pellees contend that the phrase describes the boundaries at mean
high water which is represented by the contour traced by the
intersection of the shore and the horizontal plane of mean high
water based on publications of the U. S. Coast and Geodetic
Survey. To support their position, appellees called a surveyor in
private practice who surveyed the parcels on September 19, 1962.
Basing his survey on publications of the U. S. Coast and Geodetic

Survey, appellees' surveyor described the process which he used in delineating the boundaries at mean high water.

The State of Hawaii, appellant, denies that the makai boundaries of the two lots are correctly designated by the appellee, and claims that "ma ke kai" is approximately 20 to 30 feet above the line claimed by the appellee. The State contends in this case that "ma ke kai" is the high water mark that is along the edge of vegetation or the line of debris left by the wash of waves during ordinary high tide.[1] In the trial court, the State presented kamaaina witnesses[2] for the purpose of establishing, by reputation evidence, the location of "ma ke kai" and also the location of public and private boundaries along the seashore in accordance with tradition, custom and usage in old Hawaii. The questions posed to the witnesses along this line were objected to and sustained by the court. However, the court allowed the witnesses to answer the questions, subject to the objections, to preserve the record for the purpose of appeal to this court.

We are of the opinion that "ma ke kai" is along the upper reaches of the wash of waves, usually evidenced by the edge of vegetation or by the line of debris left by the wash of waves, and that the trial court erred in finding that it is the intersection of the shore with the horizontal plane of mean high water.

The trial court erred in sustaining the objections by the appellees to certain questions put to kamaaina witnesses involving the location of "ma ke kai."

When the royal patents were issued in 1866 by King Kamehameha V, the sovereign, not having any knowledge of the data contained in the publications of the U. S. Coast and Geodetic Survey, did not intend to and did not grant title to the land along the ocean boundary as claimed by the appellees. Hawaii's land laws are unique in that they are based on ancient tradition, custom, practice and usage. *Keelikolani* v. *Robinson*, 2 Haw. 514.

---

[1] The description excludes any line caused by extraordinary phenomena such as storms and tidal waves.

[2] "We use the word 'kamaaina' above without translation in our investigation of ancient boundaries, water rights, etc. A good definition of it would be to say that it indicates such a person as the above witness described himself to be, a person familiar from childhood with any locality." *In re Boundaries of Pulehunui*, 4 Haw. 239, 245.

The method of locating the seaward boundaries was by reputation evidence from kamaainas and by the custom and practice of the government's survey office. It is not solely a question for a modern-day surveyor to determine boundaries in a manner completely oblivious to the knowledge and intention of the king and old-time kamaainas who knew the history and names of various lands and the monuments thereof.

In this jurisdiction, it has long been the rule, based on necessity, to allow reputation evidence by kamaaina witnesses in land disputes. *In re Boundaries of Pulehunui*, 4 Haw. 239; *Kanaina v. Long*, 3 Haw. 332. The rule also has a historical basis unique to Hawaiian land law. It was the custom of the ancient Hawaiians to name each division of land and the boundaries of each division were known to the people living thereon or in the neighborhood. "Some persons were specially taught and made repositories of this knowledge, and it was carefully delivered from father to son." *In re Boundaries of Pulehunui, supra.* With the Great Mahele in 1848, these kamaainas, who knew and lived in the area, went on the land with the government surveyors and pointed out the boundaries to the various divisions of land. In land disputes following the Great Mahele, the early opinions of this court show that the testimony of kamaaina witnesses were permitted into evidence. In some cases, the outcome of decisions turned on such testimony. See *In re Boundaries of Pulehunui, supra; Kanaina v. Long, supra; In re Boundaries of Kapahulu*, 5 Haw. 94.

Two kamaaina witnesses, living in the area of appellees' land, testified, over appellees' objections, that according to ancient tradition, custom and usage, the location of a public and private boundary dividing private land and public beaches was along the upper reaches of the waves as represented by the edge of vegetation or the line of debris.[3] In ancient Hawaii, the line of

---

[3]Section 1-1, R.L.H. 1955, provides as follows:
   "*Common law of Territory; exceptions.* The common law of England as ascertained by English and American decisions, is declared to be the common law of the Territory of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the Territory, or fixed by Hawaiian judicial precedent, or *established by Hawaiian usage;* that no person shall be subject to criminal

growth of a certain kind of tree, herb or grass sometimes made up a boundary.[4] *In re Boundaries of Pulehunui, supra* at 241.

Cases cited from other jurisdictions cannot be used in determining the intention of the King in 1866. We do not find that data or information published and contained in the publications of the U. S. Coast and Geodetic Survey were relied upon by the kamaainas for the purpose of locating seaward boundaries in Hawaii. All of the matters contained in such publications were unknown to the ancient Hawaiians and foreign to the determination of boundaries in Hawaii. Property rights are determined by the law in existence at the time such rights are vested. *In re Title of Pa Pelekane*, 21 Haw. 175; *Keelikolani* v. *Robinson, supra; In re Kakaako*, 30 Haw. 666, 674; *Harris* v. *Carter*, 6 Haw. 196.

We find no reference concerning the location of boundaries in Hawaii, prior to 1866, to data contained in the U.S. Coast and Geodetic Survey or to high water mark as the intersection of the seashore with the horizontal plane of mean high water, or .7 or .9 of a foot above sea level. The trial court erred in holding that this was an area solely for the expert testimony of a surveyor to determine from data contained in publications of the U. S. Coast and Geodetic Survey.

Reversed and remanded for further proceedings consistent with this opinion.

*Andrew S. O. Lee,* Deputy Attorney General *(Bert T. Kobayashi,* Attorney General, with him on the briefs) , for respondent-appellant.

*Charles B. Dwight III (Stephenson, Ashford & Wriston* of counsel) for applicants-appellees.

proceedings except as provided by the written laws of the United States or of the Territory." (Emphasis added.)

[4]The State's expert witness, the government surveyor, noted that it was the practice among the surveyors on the Island of Hawaii to use the limu or moss on the rocky coasts to delineate a boundary.

The surveyor stated that the mean high tide line used by private surveyors is usually further makai than the edge of vegetation or line of debris. He noted that in some areas in the islands, high water mark as defined by appellees placed the boundary under water even during low tide. The State's exhibit "D" in evidence indicates that the appellees' line at mean high tide is very nearly coincidental with the line formed at low tide.

DISSENTING OPINION OF MARUMOTO, J.

I am constrained to dissent. This decision is one that will "count for the future."[1] Its effect will not be limited to the case at hand. So long as it remains unaltered as the last word of this court on the subject, it will control the determination of the seaward boundary of every parcel of unregistered private land in this State in which the title document describes the seaward boundary as being "along the sea"; and, also, the determination of the seaward boundary of every parcel of private land built up by accretion to registered land and the seaward boundary of every parcel of registered land left over after erosion.

The decision will not have any effect on the determination of seaward boundaries of government lands, for the complete dominion of the State over its lands extends beyond low water mark and into the sea and when the government decides to dispose of any of its oceanside lands to private purchasers, it may select any line it pleases as the seaward boundary of the parcel to be sold.

Because the decision has the potential future impact described above, I will state my position in greater detail than is normal in dissents to decisions which do not have such impact.

The pertinent facts of this case may be stated by reference to the accompanying sketch.

The parcel of land sought to be registered is located in Kainalu, Molokai, and is shown on the sketch as bounded by lines AB, BC, CD, and DA, line DA being the seaward boundary. As stated in the opinion of the court, this parcel is made up of makai portions of the lands covered by Royal Patents 3004 and 3005, dated Febrary 2, 1866.

Royal Patents 3004 and 3005 were issued in conveyance of

---

[1]Cardozo, *The Nature of the Judicial Process*, pp. 165-166 (1921) : "Finally there remains a percentage, not large indeed, and yet not so small as to be negligible, where a decision one way or the other, will count for the future, will advance or retard, sometimes much, sometimes little, the development of the law. These are the cases where the creative element in the judicial process finds its opportunity and power. * * * Here come into play that balancing of judgment, that testing and sorting of considerations of analogy and logic and utility and fairness, which I have been trying to describe. Here it is that the judge assumes the function of a lawgiver. * * * "

government lands. The lands covered thereby were portions of the ahupuaa of Kainalu. This ahupuaa was accepted by the House of Nobles and Representatives of the Hawaiian Islands, assembled in Legislative Council, as government land on June 7, 1848. *Indices of Land Commission Awards 1929*, pp. 25-46.

——————— Mean high water line
— — — — Debris line
— • — • — Vegetation line

The Government Survey of Hawaii, which is the earliest predecessor of the present State Survey Division, adopted the practice of referring to royal patents on government lands as "Grants" in order to distinguish them from "Royal Patents" issued in confirmation of Land Commission awards. So, Royal Patents 3004 and 3005 will hereafter be referred to as Grants 3004 and 3005.

In 1866, when Grants 3004 and 3005 were issued, the ocean frontage was along lines EF, FG and GH. In the course of a century, the frontage receded by erosion to where it is at the present time. In the grants, the seaward boundary was described by the Hawaiian words *ma ke kai*. At the trial, the parties agreed that *ma ke kai* may be translated as "along the sea."

The question for decision on this appeal is the location of the seaward boundary of the parcel sought to be registered.

Applicants located the boundary along mean high water line, which is the contour of intersection of ocean frontage with the level of mean high water. Applicants determined the level of mean high water by using tidal information contained in the publications of the United States Coast and Geodetic Survey.

The court below adjudged that applicants correctly located the seaward boundary. The State contends that the court erred in "not finding that *ma ke kai* or the seaward boundary is along the edge of vegetation or the line of debris where waves wash during ordinary high tide."

The general location of mean high water line, debris line and vegetation line on the ocean frontage of subject parcel is shown on the sketch. The debris line lies inland of the mean high water line, and vegetation line lies farther inland from the debris line. The distance between the mean high water line and the vegetation line is about 30 feet.

The argument of the State in support of its contention may be divided into three parts, as follows:

I. Kamehameha V did not have any knowledge of the data contained in the publications of the United States Coast and Geodetic Survey when he issued Grants 3004 and 3005 in 1866, and so he did not intend to, and did not, give title seaward to the mean high water line determined by using such data.

II. Under Hawaiian land laws, the method of locating seaward boundaries of private lands was by reputation evidence from kamaainas because such laws were based on ancient tradition, custom, practice and usage.

III. The practice and usage of the government survey office in locating the seaward boundaries of oceanside lands was to locate such boundaries along vegetation line or debris line without regard to the words used in the title documents to describe such boundaries.

On this appeal, what the State is asking this court to do is to declare as *the law* for the determination of the seaward boundaries of private lands in this sovereign state, which prides itself in being a progressive member of the federal union of states, a practice primitive in concept and haphazard in application and result, which the United States Supreme Court rejected for use by the federal government, and to reject for use in this state a practice scientific in concept, uniform in application and precise in result, which the United States Supreme Court approved for use by the federal government.

In *Borax, Ltd.* v. *Los Angeles*, 296 U.S. 10 (1935), in holding that mean high water as defined by United States Coast and Geodetic Survey is the limit of federal grant, Chief Justice Hughes stated for the court, at page 22:

> "The tideland extends to the high water mark. * * * This *does not mean * * * a physical mark made upon the ground by the waters*; it means the line of high water as determined by the course of the tides." (Emphasis supplied)

In the discussion which follows, I will show that the position of the State is based on spurious historical assumptions and that there is no reason for Hawaii to deviate from the mainstream of American decisions represented by *Borax, Ltd.* v. *Los Angeles, supra.*

In the course of the discussion, I will refer to information contained in encyclopedias, historical writings, official documents, and files of early cases appealed to this court. Judicial notice may be taken of such information as "specific facts * * * which are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy." American Law Institute, *Model Code of Evidence*, Rule 802 (1942); C. Mc-Cormick, *Handbook of the Law of Evidence*, §§ 329, 331 (1954).

I. The State begins the first part of its argument with the statement that "when the Royal Patents in question were issued in 1866 by Kamehameha IV, the sovereign, not having any knowledge of any of the data contained in the publications of the U. S. Coast and Geodetic Survey, never intended and did not grant title to the land along the ocean boundary in the manner claimed

by appellees." I will discuss this statement on the basis that the reference therein to Kamehameha IV was meant to refer to Kamehameha V, the reigning sovereign. Kamehameha IV died in 1863, and so in 1866 he was not the reigning sovereign.

The quoted statement contains three assumptions—first, that Kamehameha V was solely responsible for the issuance of Grants 3004 and 3005 and the grants expressed his royal will and the will of no one else; second, that Kamehameha V did not have any knowledge of any of the data contained in the publications of the United States Coast and Geodetic Survey; and, third, that Kamehameha V did not intend to, and did not, give title seaward to mean high water line.

The first assumption is false. The second assumption may be true, but is immaterial. The third assumption may or may not be true, but, in any event, it is immaterial.

The first assumption would have been correct if Grants 3004 and 3005 covered crown lands. Under the Act of June 7, 1848, "An Act Relating to the Lands of His Majesty the King and of the Government," the sovereign was empowered to dispose of any of the crown lands "according to his royal will." But the same act provided with respect to government lands as follows:

"* * * And we do hereby appoint the Minister of the Interior and his successors in office to direct, superintend, and dispose of said lands, as provided in the Act to organize the Executive Departments, done and passed at the Council House in Honolulu, the 27th day of April, A. D., 1845: Provided, however, that the Minister of the Interior and his successors in office shall have the power, upon the approval of the King in Privy Council, to dispose of the government lands to Hawaiian subjects, upon such other terms and conditions as to him and the King in Privy Council, may seem best for the promotion of agriculture, and the best interests of the Hawaiian Kingdom."

This provision, and the provisions of the Act of April 27, 1845, mentioned therein, were incorporated in the Civil Code of 1859. The provisions of the code pertinent to this case are contained in sections 39, 42, 43 and 44. Section 39 placed the custody and

management of all government lands in the minister of the interior; section 42 empowered the minister of the interior, with the authority of the King in cabinet council, to sell or otherwise dispose of government lands *in such manner as he deemed best* for the promotion of agriculture and the general welfare of the kingdom, subject to such restrictions as might from time to time be expressly provided by law; section 43 provided that grants be signed by the King and countersigned by the kuhina nui and the minister of the interior; and section 44 required the department of the interior to prepare and issue all grants.

Grants 3004 and 3005, being in conveyance of government lands, were presumably issued in accordance with the code provisions mentioned above. Thus, the responsibility for their issuance lay not with Kamehameha V but with the department of the interior headed by the minister of the interior, and the will expressed therein was the collective will of Kamehameha V, his minister of the interior and his other ministers who were members of the cabinet council.

With reference to the second assumption, it is immaterial whether Kamehameha V had any knowledge of any of the data contained in the publications of the United States Coast and Geodetic Survey. It is also immaterial whether the King's ministers had any such knowledge. What is material is whether in 1866 Hawaii was sufficiently advanced scientifically to know that tide levels could be determined by the use of assembled tidal data, so that such knowledge might be imputed to the King and his ministers.

Scientific study of the tides dates from 1687, with the publication of Isaac Newton's *Principia.* Automatic tide gauges came into use about 1830. The first tide table was published by the British Admiralty in 1833, and this was followed by the publication of the tide table of the French Hydrographic Service in 1839. The United States Coast and Geodetic Survey began publishing its tide tables in 1853. 26 *Encyclopedia Americana,* p. 612 (1963 ed.) ; 21 *Encyclopedia Britannica,* p. 195 (1967 ed.) .

There are no historical materials from which this court may determine whether the tide tables mentioned above were avail-

able in Hawaii in 1866, and if available, whether they could have been used locally. But this court may reasonably conclude from information contained in the following publications, namely:

W. D. Alexander, *A Brief Account of the Hawaiian Government Survey, Its Objects, Methods and Results* (1889) ; and

Curtis J. Lyons, *A History of the Hawaiian Government Survey with Notes on Land Matters in Hawaii, Appendixes 3 and 4 of Surveyor's Report for 1902* (1903),

that by 1866 Hawaii had attained sufficient scientific sophistication to know that tide levels could be determined by the use of assembled tidal data.

The Hawaiian Government Survey, about which Alexander and Lyons wrote in the publications mentioned above, was established in 1870 with an appropriation of $5,000 which the minister of the interior obtained that year from the legislature.

Alexander was the first surveyor general. He served in that position for more than 30 years until 1901, when he resigned to accept a position with the United States Coast and Geodetic Survey. He was born in Honolulu, educated at Yale, from which he graduated in 1855 with honors and as class salutatorian, and returned to Honolulu in 1857. He was a fellow of the Royal Geographic Society and a member of the Astronomical Society. Hawaiian Historical Society, *21st Annual Report 1912,* p. 6.

Lyons stated on page 9 of his history:

"The newly appointed Surveyor-General placed himself in communication with the U.S. Coast Survey. The officers of this bureau were extremely courteous, and loaned to the Hawaiian Survey a high class base-line apparatus and other instruments. The methods of the Coast Survey, also of the British Ordinance Survey, the Great Indian Survey and the Australian and New Zealand Surveys were studied for suggestive guidance in this work."

Lyons was Alexander's assistant from the inception of the Survey. Before taking that position, he had extensive experience in ahupuaa, kuleana, and grant surveying. He did his surveying

as early as 1853. He was a member of the legislature in 1868, and showed his concern for accurate land survey by obtaining an appropriation of $3,000 to begin a general survey, although this appropriation was not used. Lyons, *supra*, p. 6.

Alexander published his account of the Hawaiian Government Survey by order of the minister of the interior. The account contains the following statement on page 18:

> "During the latter part of 1872 a self registering tide gauge, constructed by Mr. F. L. Clarke, was in operation at the Honolulu Light-house for several months. It finally broke down, owing to a failure of the clock work but its records are sufficient to indicate the general laws of the tides at this place. A second tide gauge at Hilo was swept away by an extraordinary rise of the sea, but has been replaced, and is again in operation. A new tide gauge of the most improved pattern, has been promised us by the U.S. Coast Survey."

Lyons' history, as noted in its title, was a part of the surveyor's report of 1902. Lyons stated on page 17 as follows:

> "The Survey has been the main stand-by in all matters of scientific precision. Very shortly after its inception, enough tide measurements were made with a home-made tide gauge to determine the general law of the tides, and in 1880 a self-registering tide gauge was loaned by the U. S. Coast Survey, which was set up in Honolulu Harbor and kept record for some years. A more modern instrument by Hugo Bilgram was procured and set up in a thorough-going style in 1891. From its record and tide predictions of the Coast Survey Tables are derived, careful records are made of the changes in mean sea level, and any earthquake waves or other deep sea disturbances that come to these shores are noted."

The significance of the references in Alexander's account and Lyons' history to tide measurements and mean sea level is that the determination of mean sea level is indispensable in a scientific survey system in that mean sea level is a necessary point of reference in reducing the lengths of base lines established for surveying purposes to their lengths at mean sea level.

The State argues that the readings taken in Honolulu harbor in the early days were taken for navigation purposes and had no bearing in determining seaward boundaries, and states:

"Tide readings in Honolulu Harbor became necessary because of large foreign vessels invading the Hawaiian shores. Such tidal readings would have no significance or be of no concern to the ancient Hawaiians who navigated the oceans by canoes."

Such argument displays gross ignorance of the essential requirements of a survey system which makes any claim to accuracy. When the Hawaiian Government Survey undertook to establish an Oahu base-line in 1872, mean sea level had not yet been established and so the surveyors had to work from an assumed mean sea level. In this connection, Lyons states on page 11 of his history:

"In connection with this base a series of exact levels were run from the foot of Nuuanu Street where an assumed mean sea-level was taken, out to the base-line and over its entire length. A bench-mark established on this line of levels on the front of the present Judiciary Building has been the standard of all city work ever since."

The events related by Alexander and Lyons in their statements quoted above postdated the issuance of Grants 3004 and 3005 by several years. But, from a reading of their publications which clearly show the broad scope of their knowledge regarding contemporary scientific developments, I think that it is not far-fetched to say that in 1866 Alexander and Lyons knew that mean tide levels could be determined by the use of assembled tidal data, and that through them Hawaii had such knowledge.

Turning now to the third assumption, here again the individual intention of Kamehameha V is immaterial. What is material is the collective intention of the King, the minister of the interior and his other ministers who were members of the cabinet council, as expressed in Grants 3004 and 3005.

At the time of the issuance of Grants 3004 and 3005, the minister of the interior was F. W. Hutchison. By virtue of his

position, he was a member of the cabinet council. The other members of the cabinet council were C. C. Harris and C. de Varigny. Harris was minister of finance, and Varigny was foreign minister. T. Thrum, *Hawaiian Almanac and Annual for 1891,* p. 93.

The problem exists in this case because the intention of the King and his ministers was not precisely expressed in Grants 3004 and 3005.

In this situation, the task of this court is to arrive at a reasonable conclusion as to their intention upon consideration of relevant factors and to treat such conclusion as their intention. In doing so, I think the relevant factors to be considered are the background of the King and his ministers; the state of the law of other jurisdictions relative to the subject at hand; and the influences tending to affect the thinking of the King and his ministers.

I will now proceed to discuss these factors.

*Background of the King and his ministers.* Kamehameha V was not a primitive monarch. He knew the world outside of Hawaii through his travels to the United States, England, France and Canada. J. Adler, *The Journal of Prince Alexander Liholiho,* (1967). He was not a mere figure-head, but a monarch with a mind of his own. *Territory* v. *Liliuokalani,* 14 Haw. 88, 90 (1902). He was a man of intelligence, and exhibited considerable administrative ability as the minister of the interior under Kamehameha IV, his younger brother. W. D. Alexander, "Brief Sketch of the Life of Kamehameha V," Hawaiian Historical Society, *3rd Annual Report 1894,* p. 10. He was a member of the committee which codified existing laws and produced the Civil Code of 1859. On this committee he worked with Chief Justice W. L. Lee and Associate Justice G. M. Robertson, and with Chief Justice E. H. Allen after the death of Chief Justice Lee. Civil Code of 1859, *Preface,* p. iii. He thus had considerable exposure to legal matters.

Harris was a native of New Hampshire, educated at Harvard. He was chief justice from 1877 to 1881. Before that, he served Kamehameha V successively as attorney general, minister of fi-

nance and foreign minister. In 1874 he was appointed associate justice. *In Memoriam, Hon. Charles Coffin Harris,* 4 Haw. 678 (1881). Ralph Kuykendall says in *The Hawaiian Kingdom, 1854-1874,* p. 126 (1953), "that Harris was nearest to the King in his views on specific problems that came up for solution * * * and when Harris' opinions differed from those of his colleagues, the King generally followed his advice."

Hutchison was an English physician, who first served Kamehameha V as court physician, and later became his minister of the interior. Kuykendall, *supra,* p. 126. He also served as president of the Bureau of Immigration. As the minister of the interior, he obtained the legislative appropriation required for the establishment of the Hawaiian Government Survey, and obtained the services of Alexander as the surveyor general.

Varigny was a Frenchman who served the King with distinction as minister of finance and later as foreign minister. He was also a member of the board of education. Kuykendall, *supra,* pp. 107, 126.

*State of the law of other jurisdictions relative to the subject at hand.* At the time of the issuance of Grants 3004 and 3005, the prevailing rule in common law jurisdictions on the location of the seaward boundary of private lands was that such boundary was along the line of ordinary high tide. On the other hand, the rule in civil law jurisdictions was that the boundary was at the line reached by the highest tide during the winter season. J. Angell, *A Treatise on the Right of Property in Tide Waters and in the Soil and Shores Thereof,* pp. 66-72 (2nd ed. 1847).

The Civil Code of 1859 contained the following provision:   .

> "Section 823. The several courts may cite and adopt the reasonings and principles of the admiralty, maritime, and common law of other countries, and also of the Roman or civil law, so far as the same may be founded in justice, and not in conflict with the laws and customs of this kingdom."

This was a codification of a similar provision in Chapter I, section III, of the Act of September 7, 1847, "An Act to Organize the Judiciary Department of the Hawaiian Islands." The provision presently incorporated in R.L.H. 1955, § 1-1, which declares

the common law of England, as ascertained by English and American decisions, to be the common law of Hawaii, except as fixed by Hawaiian judicial precedents or established by Hawaiian usage, did not become a part of Hawaiian statutory law until it was enacted in the Session Laws of 1892, chapter LVII, section 5.

*Influences tending to affect the thinking of the King and his ministers.* During the reign of Kamehameha V, the influences which tended to affect the thinking of the King and his ministers were oriented entirely on the side of the common law.

As noted previously, within the cabinet itself, Harris, a New Englander with a Harvard education, exercised predominant influence. Also, within the inner circle, though not a cabinet member, was Chief Justice Allen, who before coming to Hawaii, served one term in the United States Congress as a congressman from Maine. Kuykendall, *supra,* p. 126; *In Memoriam, Hon. Elisha H. Allen,* 4 Haw. 687 (1883). In addition to these two men, the following persons were members of the privy council: G. M. Robertson, R. G. Davis, L. Andrews, and A. Fornander. *Privy Council Minutes,* January 19, 1866. Each one of them, at one time or another, served as associate justice.

I think that in the light of the factors discussed above, the most reasonable conclusion to be arrived at is to attribute to the King and his ministers an intention to follow the prevailing rule in common law jurisdictions and to locate the seaward boundaries of private lands at the line of ordinary high tide.

II. The second part of the State's argument, which relates to the location of boundaries according to ancient tradition, custom, practice and usage, has no relevance in this case.

The State attempted to establish, by its so-called "reputation evidence from kamaainas," that vegetation line was, by tradition, custom, practice and usage, the seaward limit of private title to oceanside lands. In this attempt, it elicited from witnesses, who themselves were not kamaainas, testimony that they heard kamaainas, now deceased, say that the edge of vegetation was the high water mark and that vegetation line was the boundary between public land and private land on a seashore in Hawaii. Such testimony is meaningless in this case.

Under the applicable provisions of the Civil Code of 1859, the minister of the interior, with the authority of the King in cabinet council, had a *carte blanche* to create titles *de novo* with respect to government lands, subject to such restrictions as might from time to time be expressly provided by law but otherwise unshackled from the dead hand of the past.

At the time of the issuance of Grants 3004 and 3005, there was no law expressly restricting any conveyance of government lands to an area above the vegetation line and leaving the lower area for use by the public. So, the minister of the interior, with the authority of the King in cabinet council, could have conveyed even to low water mark.

The conveyance in Grants 3004 and 3005 was not specifically to vegetation line, nor was it specifically to low water mark; it was *ma ke kai,* or to a line along the sea.

So, as previously discussed, the question which confronts this court is, "What did Kamehameha V and his ministers mean by using the words *ma ke kai* in describing the seaward boundary?" Ancient tradition, custom, practice, and usage have nothing to do in resolving this question. The factors to be considered have already been mentioned and considered in the preceding portion of this dissent.

It may be argued that tradition, custom, practice and usage are relevant because the words *ma ke kai* were used with the traditional and customary practice and usage in mind. Even if the cogency of such argument is granted, still no weight need be given to the testimony of State's witnesses in this regard.

The effect of such testimony is that throughout the Hawaiian kingdom, by tradition and custom, dating from the hoary past, vegetation line was the seaward limit of private title to oceanside lands and below that line was the seashore or beach which belonged to the public.

Such testimony runs counter to the well known fact that in many instances private title to oceanside lands in Hawaii extended to low water mark, as shown in the following reported cases. *Haalelea* v. *Montgomery*, 2 Haw. 62 (1858) ; *Territory* v. *Liliuokalani*, 14 Haw. 88 (1902) ; and *Brown* v. *Spreckels*, 14

Haw. 399 (1902), 18 Haw. 91 (1906), aff'd. 212 U.S. 208 (1909). These cases will be discussed below, together with *Halstead* v. *Gay*, 7 Haw. 587 (1889) ; *Boundaries of Pulehunui*, 4 Haw. 239 (1879) ; and *Koa* v. *Kaahanui*, 6 Haw. 167 (1876), to show that the testimony of the witnesses for the State is not supported by Hawaiian history as preserved in permanent written records in the files of this court as contrasted to history as preserved in the fallible memory of man.

(a) *Haalelea* v. *Montgomery* (1858). In 1849 Haalelea conveyed to Montgomery a portion of the ahupuaa of Honouliuli by a deed which described the seaward boundary as "following along the edge of the sea (reserving all of the reef in front) to end of stone wall by sea. * * *" Under this description, Montgomery claimed title to deep water at the outer edge of the reef, thereby claiming piscary right in the fishing ground lying between low water mark and outer edge of the coral reef, under the Act of April 27, 1846. The court denied the claim. Though not expressly stated, the decision contains a clear implication that the seaward boundary extended to low water mark. The court at page 67, stated that if the survey description extended to the outer edge of the reef, "it is a fact that could be readily ascertained by measurement." This shows that, as early as 1858, the court considered the location of a seaward boundary not as a matter controlled by tradition and custom but as being a matter governed by survey description, and, depending on the survey description, such boundary could have extended even below the low water mark to the outer edge of the reef.

(b) *Territory* v. *Liliuokalani* (1902). The case involved land in Waikiki covered by Royal Patent 5588, issued to Ane Keohokalole, mother of Liliuokalani, in confirmation of her preexisting konohiki ownership, on March 23, 1866, one month after the date of issuance of Grants 3004 and 3005, and signed by Kamehameha V and F. W. Hutchison, the very same persons who signed Grants 3004 and 3005. The royal patent described the seaward boundary as running "along sea at low water mark." This seaward boundary was in the Kuhio Beach area, presently the very center of Waikiki. Liliuokalani acquired the land from

her mother, and gave a license to the late John H. Wilson to take sand and gravel from the beach for commercial purposes. The Territory filed a bill in equity for injunction on the following grounds:

(1) That Kamehameha V had no lawful power or authority to convey below high water mark;

(2) That "the sea beach at Waikiki, where said tide lands are, is a bathing place of general resort in or adjacent to the city of Honolulu, and that the use, control and benefit of said tide lands by the Territory of Hawaii are of enormous value to the Territory for the health, recreation and pleasure of its citizens and the attraction of tourists and others."

This court ordered dismissal of the bill, holding that the first ground was not well taken in that conveyance to the low water mark was legal. The second ground was not discussed in the opinion of the court, but Thomas Fitch, Esq., a member of the bar who sat as a substitute judge, stated in his concurring opinion at page 97:

"In no usage, decree, constitution or law of the kingdom of Hawaii can be found any mention of such a thing as a right or privilege of bathing."

When the case was before the circuit court, there was a contempt hearing against Wilson for violating an order temporarily restraining him from taking sand and gravel from the beach area below high water mark.

At the hearing Wilson testified in his defense as follows: that he did not want to disobey the court order, and so he asked the Territory to have its engineers establish what they considered to be the high water mark; that in response to this request, he received a letter from the superintendent of public works stating that "there is an injunction from the Court against your taking or hauling away sand from the above beach, you are therefore the best judge where your right begins and ends without disobeying the order of the Court"; that after receiving the letter, he went to the survey office to find out where the nearest bench

marks were, and found out that there was a bench mark about 300 feet from the beach; that thereupon he took his level to the bench mark, ran it back from there, and "simply added a foot to the mean tide and called it high water mark" because "the tide here rises about two feet, * * * that is the highest"; that he put in stakes at the elevation of the high water mark as so determined, and instructed his men not to go within six feet of those stakes; and that all the sand taken by his men was taken more than six feet away from the stakes.

In addition to so testifying himself, Wilson called three witnesses to testify with regard to the method of establishing the high water mark. These witnesses were O. L. Sorenson, R. E. Maynard, and Thomas G. Thrum. Sorenson was a staff member of the survey office, described on page 21 of Lyons' history as follows: "Mr. O. L. Sorenson, after working for some time in the Public Lands Office, came into the Survey Office in 1898, and has been mostly employed on city work, and is now assistant in charge of office." Maynard was an engineer in active private practice since 1894. Thrum was registrar of conveyances during the years 1888-1904. Wilson himself was an engineer, being a graduate of Stanford and a staff member of the department of public works before entering private contracting business.

Inasmuch as the State contends here that the records of the survey office are "completely devoid of the method used by appellees' surveyor," Sorenson's testimony will be set forth below in its entirety:

### Direct Examination

"Mr. Wilder, Q. What is your occupation?

"A. Surveyor.

"Q. Employed by whom?

"A. By the Hawaiian Government,—Territorial Government.

"Q. In the Survey Office?

"A. Survey Office.

"Q. As such were you acquainted with bench mark that the Survey Department has at Waikiki?

"A. Yes sir.

"Q. Where is it?

"A. It is about opposite Ocean View. I believe it is near Ocean View on the wall of the Waikiki bridge.

"Q. Who put that bench mark there?

"A. I did.

"Q. For what purpose?

"A. For the purpose of running a line level to the new reservoir at Diamond Head.

"Q. Can you ascertain from this bench mark down there what is mean tide with a level?

"A. Mean tide is our city data. You have to work that out.

"Q. Can you find high water mark from that bench mark out there?

"A. Approximately.

"Q. Well please explain how you ascertain it?

"A. High water mark is,—I have always taken high water mark as being a foot above our city data.

"Q. That is approximately a foot?

"A. Approximately a foot, it varies. It varies a little.

"Q. Without regard to the action of the waves?

"A. Without regard to the action of the waves.

"Q. And that is what you consider high water mark?

"A. That is what I consider high water mark."

Cross-Examination

"Mr. Dole. Q. High water mark varies from time to time, the shore line, with the action of the waves in taking away the sand or bringing it up?

"A. No. It don't.

"Q. The line of high water changes with the action of the waves, does it not sometimes advancing and sometimes receding?

"A. Yes sir.

"Q. And in what you call high water mark you mean the same as Mr. Wilson does when he says still water and don't include the wash of the waves breaking in?

"A. Yes."

Maynard testified to the same effect, and the parties stipulated that Thrum would also testify to the same effect.

The Territory alleged in its complaint for disobeying the injunction that the high water mark was the mauka edge of the flow of the waves at high water "clearly marked by the deposit of seaweed," but did not call any witness to support such allegation.

The mean tide mentioned in the testimony of Wilson and Sorenson is the plane that lies midway between mean high water and mean low water. As in Wilson's case, Sorenson took one foot above mean tide as the high water mark from the fact that in Hawaii "the average rise and fall of the tide is two feet." *Halstead* v. *Gay, supra*, 587.

Thus, the method testified to by Wilson and his witnesses was in essence the method used by applicants' surveyor, the only difference being that Wilson and his witnesses made a rough approximation, while applicants' surveyor made a precise calculation from scientifically determined tide measurements.

(c) *Brown* v. *Spreckels* (1902). There were two title documents in the case: (1) Royal Patent 1144 issued by Kamehameha III to Kalaeloa on July 7, 1853, which described the seaward boundary as running "along the edge of the sea"; and (2) deed from Kamehameha III to E. G. J. Bates on September 19, 1853, which conveyed an upland area described by courses, distances and monuments, and "also sea beach in front of the same down to low water mark." The court held that, with respect to the royal patent issued to Kalaeloa, the description therein carried the seaward boundary at least to high water mark. In discussing the deed to Bates, the court stated, at p. 410: "There is found a strip between high water mark and the lower particularly described boundary." That is, between the makai boundary of the upland area described by courses, distances and monuments, and the mauka boundary of the beach area, referred to in the quoted statement as high water mark, there was a strip of land; and the court had reference to this strip when it stated, at page 410, that "sometimes in very stormy weather the sea washed over it in places." Thus, the court treated the high water line as being below the area where the sea washed over in stormy weather.

(d) *Halstead* v. *Gay* (1889). This was an action for trespass by defendant Gay on plaintiff's land by driving an ox team thereon. On November 22, 1888, Gay testified under oath as follows:

"4 Question: Describe your map and state what land it was on which you entered by removing the fence?

\*      \*      \*      \*

"Answer to Question 4. (Witness exhibits survey of R. P. to Kuhe) The green color is the limit of the Patent, the red line is where my carts went and if it was trespass where I trespassed where my carts went is nothing but a sand beach. I entered perhaps 30 to 50 feet mauka from high water mark and that is where I took the fence down\* \* \*."

This testimony that the witness went over a sand beach "perhaps 30 to 50 feet mauka from high water mark" is significant in showing that in 1888 there was no reputation or common knowledge for the witness to be aware that high water mark was at the edge of vegetation.

(e) *Boundaries of Pulehunui* (1879). This is the leading case on the use of kamaaina testimony. The State lays great stress on the case but there is nothing in the decision which even intimates that vegetation line was the seaward boundary. The decision affirmed a boundary determination which included a seaward boundary of about 2,000 feet "from a sand spit known as Kihei to a point of rocks called Kalaepohaku."

In Webster's *Third New International Dictionary,* Unabridged (1967), "sand spit" is defined as "a small point of land commonly consisting of sand or gravel deposited by waves and currents and running into a body of water."

None of the kamaaina witnesses testified that the seaward boundary ran along the edge of vegetation. The witnesses testified only to the location of the two ends of the seaward boundary, one end being point of rocks at Kalaepohaku and the other being a "sand point" or "sand hill" at Kihei. None testified that the point of rocks was at the edge of limu or seaweed, or that the

sand point or sand hill was at the edge of vegetation. The actual Hawaiian words used by the kamaaina witnesses and translated as sand point and sand hill were "lae one" and "puu one." The word "lae" is Hawaiian for cape or promontory; "one" is sand; and "puu" is hill or mound. So, "lae one" is sand cape or promontory, and "puu one" is sand hill or mound.

It may be noted with regard to the use of kamaaina testimony in that case that the court defined a kamaaina as "a person familiar from childhood with any locality," p. 245, and disregarded the testimony of six witnesses—Monsarrat, because his was "not original testimony," p. 245; Lono, because "he was not independently acquainted with the boundaries," p. 246; Ku, because he "says he derived his knowledge of the boundaries by going out with a surveyor," p. 248; Hoopii, because he "only heard of the boundaries from Joe Sylva in going after cattle, and had not seen them," p. 248; Kaupaa, because his testimony was "a bald one," p. 254; and Keliikoa, because "he only knows it because he once saw some surveyors set their flags and make this the line," p. 254.

(f) *Koa* v. *Kaahanui* (1876). This is the only decision construing section 1478 of the Civil Code of 1859, which is compiled in R.L.H. 1955, § 14-2, providing that all wood which may drift on to the beach shall be the property of the finder. The case involved a piece of wood found on a privately owned beach in Punaluu, of which plaintiff was sublessee. Plaintiff claimed the wood as being property on his land. The court, in rejecting plaintiff's claim, held that, under the statute, ownership of driftwood did not depend on whether the article was found on public land or private land, but on the exercise of some act of ownership to convert it to private use, and that a landowner was not entitled to the article merely by the fact that it was found on his land. The State argues that the statute was an indication that the "early Hawaiians considered the seaward boundary to be along the upper reaches of the waves at high tide." The decision shows it to be otherwise.

Pertinent also to the consideration of this portion of the State's argument is the following statement on page 61 of Lyons'

history, where Lyons sets forth his view of the proper method of describing boundaries:

"The whole line should be described by bearings and distances, even when it is a gulch or line of coast, or a ridge. It is not sufficient to say, 'Thence along the shore to point of beginning.' For one reason, there should always be a check to the work which can only be furnished by a *complete chain of courses* around the whole piece. For another reason it is often desired to plot the land from the notes in connected district maps. It is not, however, proper to closely follow the crooks and turns, in said notes. The best way is to connect prominent points in ridges, coasts and gulches, and give the direct course and distance from one to another, adding the formula, 'the middle of the gulch' (or top of ridge, or high-water mark as the case may be) 'being the boundary.' In fact, no survey ought to be accepted, either by land owners or by the Government, that does not thus locate every salient point of the boundary, and at the same time prove itself."

Remembering that this statement was made at the turn of the century in an appendix to the surveyor's report of 1902, by a person who had extensive surveying experience in Hawaii beginning as early as 1853, the omission therein of any reference to "edge of vegetation" or "vegetation line" is significant, particularly in view of the fact that there is specific mention of physical features such as "the middle of the gulch" or "top of ridge" as additional descriptive words to be used in connection with a description of boundary by courses and distances. The omission is indicative of the absence of any tradition, custom, practice, or usage to consider the edge of vegetation as the high water mark.

III. The third part of the State's argument, relating to the practice and usage of the government survey office, is based entirely on the testimony of James M. Dunn, who was State Land Surveyor at the time of the trial. Dunn got his first job in 1920 as a rodman in the survey office and had worked continuously in that office since that time.

Dunn testified that when he began working in the survey office, the field personnel of that office usually located the high

water mark on government lands at the edge of vegetation; that in 1932, Attorney General Harry Hewitt issued a written opinion in which he advised the survey office to use mean high water line in locating the boundary between private land and public land on a rocky Kona coast; that despite this opinion, survey office personnel continued to follow the former practice in surveying government lands; that in 1953, Attorney General Edward Sylva orally advised the survey office to use the debris line in locating the high water mark; and that thereafter to the time of the trial, the survey office operated under the instruction of the attorney general's office to use the debris line.

Dunn limited his testimony to the period of his service in the survey office. He disclaimed any knowledge of any survey office practice before 1920. The testimony shows that during the 40 odd years covered thereby, the survey office had no uniform practice in locating the high water mark, but had three different practices at different times, the practice current at the time of the trial, and dating from 1953, being the use of debris line as the high water line.

With regard to any survey office practice before 1920, although Dunn disclaimed any knowledge thereof, the record on appeal is not without some evidence on that point. The appeal record includes the decision of Judge A. M. Cristy, filed May 31, 1940, in Land Court Application No. 1225 of Phil Cass and Muriel Dranga Cass. The decision contains the following recital of the testimony of Arthur C. Alexander, son of W. D. Alexander, who was called by the Territory as its witness:

"The Territory produced several members and former members of the Survey Department of the Territory to testify to the custom of that office in regard to locating sea shore boundaries. Mr. Alexander, son of that W. D. Alexander who initiated the survey of the islands during the monarchy, testified that he started as a rodman in the survey department in 1882 and became a surveyor in 1884 under his father, from whom he derived knowledge of the principles of surveying. His father, then in charge of the survey of the Islands, instructed him that the sea shore boundary was considered the

'ordinary' high tide line. In all his experience, extending over 58 years of active surveying, it has never been necessary to determine for the government a line of accurate tidal boundaries and no custom existed based upon practice as to such locations."

The statement in the foregoing recital, and attributed to Arthur C. Alexander, that "it has never been necessary to determine for the government a line of accurate tidal boundaries," is corroborated in Dunn's following testimony:

"Q. As a matter of fact, Mr. Dunn, it hasn't been until recently that the precise location of this seaward monument has become important, isn't that correct?

"A. Not until the value of oceanside properties went up that it became important."

It may be pointed out that nowhere in Dunn's testimony is there a statement that the survey office ever used the vegetation line as the boundary between private land and public land in a controverted case, his testimony being that it was the practice of survey office personnel to use the edge of vegetation in locating the high water mark *on government lands*. A survey office practice in locating the high water mark on government lands is of no significance in determining the seaward boundaries of private lands because such practice does not determine the legal right of any private landowner *vis-a-vis* the government.

In connection with the actual practice of the survey office in carrying out the attorney general's advice on the use of debris line, Dunn testified as follows:

"Everyday during high tide the waves wash up along the beach and there is usually a line of debris and rubbish washed in by the waves, what are lined up along the beach. During low tide you can just about pick it up all along. You can see where this line of rubbish is all along the sandy beach. We don't use the extreme debris line because usually the wave during high stormy weather, the waves wash all the way up to the vegetation line and then the vegetation line, debris line become one line but we don't use that line. We use the

line that is *left by the ordinary high tides* which is further down the — along the beach near the edge of the water." (Emphasis supplied)

The foregoing testimony shows that the vegetation line is at the end of the highest wash of the waves. Thus, the use of vegetation line represents an acceptance of the civil law concept that the high water mark is at the upper limit of such wash of the waves. On the other hand, the survey office practice of using the line of debris left by ordinary high tides, and not the extreme debris line which merges with the vegetation line, represents an acceptance of the common law concept that the high water mark is at the line of ordinary high tide.

The use of mean high water line, like the use of the debris line as testified to by Dunn, is also predicated on the common law concept. The only difference between the use of mean high water line and the use of debris line lies in the practical application of the concept. In the former, "mean high water" is precisely defined and the line of mean high water is located by the use of survey instruments which make accurate determinations. In the latter, "ordinary high tide" is not defined, and the line of ordinary high tide is located by the visual observation of a surveyor who arbitrarily selects one of multiple lines of debris left on a shoreline as the line left by the ordinary high tide.

Some confusion has been injected into this case by State's Exhibit "D" showing a line described as "water's edge at low tide" roughly coinciding with the mean high water line located by applicants' surveyor, and Dunn's testimony that even during low tide the mean high water line is usually covered by water. Such evidence creates the impression that the mean high water line is no higher than the line of low tide. That this court was influenced by the mentioned exhibit and testimony is evident from its reference to them in footnote 4 of the opinion of the court.

This confusion may be cleared by an explanation of what mean high water means and how the mean high water line is located.

In the movements of ocean tides, there are two high tides, one higher than the other, and two low tides, one lower than the other, in each cycle of approximately 24 hours and 50 minutes. These tidal movements are recorded on automatic tide gauges at stations located throughout the world. Mean high water at any place is the average height of all of the high waters at that place over a considerable period of time. Other tidal levels are mean higher high water, which is the average height of the higher of the two high tides in the daily cycle; mean lower low water, which is the average height of the lower of the daily low tides; mean low water, which is the average height of all of the low tides; mean tide, which is the tidal level midway between mean high water and mean low water; and mean sea level, which is the mean level of the sea about which the tide oscillates. Mean sea level differs from mean tide, but the difference is so slight that for all practical purposes it may be considered to be at the same level as mean tide.

The station nearest to the subject land at which tidal movements are recorded is at Pukoo, which is approximately three miles west of Kainalu. At Pukoo, mean low water is 0.2 foot above mean lower low water; mean high water is 1.4 feet above mean low water, thus making mean tide 0.7 foot above mean low water and 0.7 foot below mean high water; mean higher high water is 2.1 feet above mean lower low water; and mean sea level is 0.06 foot below mean tide.

Applying the data for Pukoo to Kainalu, applicant's surveyor located the mean high water line on the subject land along an elevation 0.7 foot above mean tide. At the trial, the State stipulated that applicants' surveyor correctly located the mean high water line. That being so, the mean high water line as delineated on applicants' map was 1.6 feet above mean lower low water line and 1.4 feet above mean low water line, and could not have been at or near "water's edge at low tide."

The seeming coincidence of the mean high water line and "water's edge at low tide" on State's Exhibit "D" may be attributed to the fact that the former was located from data obtained in actual survey conducted between September 18, 1962, and

July 9, 1963, and that the latter was located from visual field check made on October 15, 1963.

There was an interval of more than one year between September 18, 1962, and October 15, 1963, and an interval of more than three months between July 9, 1963, and October 15, 1963. The ocean frontage of the subject land is a sandy beach, not a solid ground resistant to tidal ebb and flow. I think it is common knowledge that on sandy beaches changes constantly take place and a condition found on one day will not be the same one year later or even three months later.

The seeming coincidence may also be accounted for by another factor. On the day the survey office made its field check, the first low tide of the day at Pukoo was 0.3 foot above mean lower low water at 8:03 o'clock in the morning and the following high tide was 1.8 feet above mean lower low water at 1:51 o'clock in the afternoon. U. S. Coast and Geodetic Survey, *Tide Tables High and Low Water Predictions 1963 Central and Western Pacific Ocean and Indian Ocean.* The check was made in the morning. Thus, it was made during a period of rising tide when the flow of the water was toward the land.

With regard to Dunn's testimony that the mean high water line is usually covered by water even during low tide, the following testimony shows that he was talking about the tides affected by wind and waves and not of tidal condition in perfect calm:

"A. * * * The eight-tenths line is usually covered by water even during low tide.

"THE COURT: You mean —

"THE WITNESS: Yes sir. All along Kailua Beach if you run the eight-tenths line you usually walk up to your ankles or higher in water in low tide. The waves would wash in with the wind over there.

"THE COURT: Oh, with the wind.

"THE WITNESS: The wind washes the waves in on the beach."

The mean high water line located by applicants' surveyor and approved by the court below is a tide level unaffected by wind

344

and waves. This is in accord with the prevailing common law concept. *Eichelberger* v. *Mills Land & Water Co.,* 9 Cal. App. 628, 100 P. 117 (1908).

In the course of locating the mean high water line, applicants' surveyor also measured the elevation of the vegetation line on the subject land. He found that the line was not uniform throughout its length but averaged 3.5 feet above the mean lower low water. Such elevation is 1.9 feet above mean high water, 1.4 feet above mean higher high water, and 0.9 foot above the highest predicted tide in 1962, which was 2.6 feet above mean lower low water. U. S. Coast and Geodetic Survey, *Tide Tables High and Low Water Predictions 1962, Central and Western Pacific Ocean and Indian Ocean.*

In the decision announced today, this court holds that *ma ke kai* "is along the upper reaches of the wash of waves, evidenced by the edge of vegetation or by the line of debris left by the wash of waves, and that the trial court erred in finding that it is the intersection of the shore with the horizontal plane of mean high water."

From the court's *ratio decidendi* which accepts the State's historical argument and refers to the State's reputation evidence from kamaainas, it appears that the decision approves the use of vegetation line and that the debris line mentioned therein is the extreme debris line which, according to Dunn's testimony, the survey office did not use in its post-1953 practice under the advice of the attorney general.

The historical materials referred to in this dissent show that there was nothing in ancient tradition, custom, practice, or usage which dictated the use of vegetation line. The testimonies of Gay in *Halstead* v. *Gay, supra;* Wilson and Sorenson in *Territory* v. *Liliuokalani, supra;* and Alexander in Land Court Application No. 1225 of Phil Cass and Muriel Dranga Cass, amply rebut the State's questionable reputation evidence from kamaainas, of which the following testimony of Albert Kahinu, Sr., is typical:

"Q. Mr. Kahinu, have you heard what old-timers who are now deceased say according to Hawaiian custom, tradi-

tion and practice, where the location of a public boundary and the private boundary is along the seashore in Hawaii?

\*   \*   \*   \*

"A. All I hear the old-timers say the high water mark is where the water gets to the end, out in the seashore, I mean the topest part of the seashore where it meets the grass. All they say that is the high water mark."

I think that historically the common law concept of locating the high water mark along the line of ordinary high tide prevailed in Hawaii. When the court stated in *Halstead* v. *Gay, supra,* in 1889, that "In this kingdom the average rise and fall of the tide is two feet," it was unquestionably thinking of ordinary high tide and not the wash of waves to the vegetation line.

If the common law concept is the accepted norm in Hawaii, then the real issue on this appeal narrows down to a definition of the meaning of ordinary high tide. The State says that ordinary high tide is "where waves wash during ordinary high tide." Such definition obviously begs the question, for no determination as to where waves wash during ordinary high tide can be made unless there is a definition of ordinary high tide.

I think that a definition of ordinary high tide as the average of all high waters and equates it with mean high water is logical and fair. If ordinary high tide is so defined, the high water mark can be located uniformly and with precision, whether it be along sandy beaches or rocky coastal areas, by using assembled scientific data and sophisticated survey instruments.

For well nigh 50 years, all three branches of the Hawaiian government, legislative, executive, and judicial, have recognized mean high water line as the location of the high water mark in situations involving private rights and not an internal problem in the administration of government lands.

In 1915, the legislature enacted Act 169 of the Session Laws of 1915, which placed the control of all ocean shores below mean high water mark in the board of harbor commissioners. This act received Congressional approval on March 28, 1916. I agree with

the following statement in Attorney General's Opinion No. 1589, dated September 1, 1932:

"It seems fairly arguable that the local legislature, as well as Congress, considered the boundary line of private properties bounded by the sea to be along the mean high water mark, it being hardly conceivable that it was intended that there should be narrow strips of land under the control of the Commissioner of Public Lands above the mean high water mark and reaching to high water mark or the uppermost reaches of the tides."

An instance of the recognition of the mean high water line by the executive branch of the government is contained in Waikiki Beach Reclamation Agreement, dated October 19, 1928, between the Territory of Hawaii and owners of private lands in Waikiki. The agreement was made under Act 273 of the Session Laws of 1927, and provided that any beach built pursuant thereto and lying shoreward of the mean high water mark "shall become and be deemed to be natural accretion attached to the abutting property, and title thereto shall immediately vest in the owner or owners of the property abutting thereon, in proportion to their sea-frontage, subject only to the easement in favor of the public as above stated."

In the land court, besides the instant case, there were two prior contested cases in which the court approved the location of seaward boundaries of private oceanside lands along the mean high water line, despite contest by the government. They were Land Court Application No. 1225 of Phil Cass and Muriel Dranga Cass, decree entered June 19, 1940, and petition of Herbert Melville Dowsett and Laura Nott Dowsett to register title to accretion to a portion of the land registered in Land Court Application No. 616 of Harold Kainalu Long Castle, decree entered February 1, 1963. In neither of these cases did the government appeal.

I will affirm the decree of the court below.