Joseph Yuki SOTOMURA and Grace Fumiye Sotomura, Plaintiffs,

v.

COUNTY OF HAWAII, Herbert T. Matayoshi, Mayor of the County of Hawaii, Clifford Lum, Corporation Counsel of the County of Hawaii, George R. Ariyoshi, Governor of Hawaii, Ronald Y. Amemiya, Attorney General of Hawaii, Christopher Cobb, Acting Chairman and Member of the Board of Land and Natural Resources, and Shinichi Nakagawa, Larry E. Mehau, Manuel Moniz, Jr., Moses W. Kealoha and Hisao Munechika, Members of the Board of Land and Natural Resources of Hawaii, Defendants.

Civ. No. 75–0067.

United States District Court,
D. Hawaii.

Oct. 16, 1978.

Clinton Ashford and Douglas MacDougal, Ashford & Wriston, Honolulu, Hawaii, for plaintiffs.

Ronald Y. Amemiya, Atty. Gen., Russell N. Fukumoto, Deputy Atty. Gen., Honolulu, Hawaii, Clifford H. F. Lum, Corp. Counsel, Katsuya Yamada, Deputy Corp. Counsel, County of Hawaii, Hilo, Hawaii, for County of Hawaii, Matayoshi, Mayor of the County of Hawaii, Lum, Corp. Counsel of Hawaii.

## DECISION

WONG, District Judge.

In July, 1970, the County of Hawaii commenced an eminent domain action to acquire Plaintiffs'[1] seashore land for public use as a beach park. The land was describ-

---

1. Plaintiffs herein were defendants in the State court action and will herein be referred to as the "Owners." Their exhibits herein will be identified by the letter "P," the State's by the letter "S," and the County's by the letter "C."

ed in the Complaint (Ex. P1, Doc. 1) as "All of Lot 3, Land Court Application 1814, as shown on Map 1." As shown by Map 1 (Ex. S1), Lot 3 is shorefront land, bounded inland by a road and seaward by a meandering line "along highwater mark," having an area of 5.314 acres. The Owners' predecessors registered this land in the Land Court of the State of Hawaii ("the land court") in 1962 and obtained a Decree of Registration (Ex. P40g) and Owner's Certificate of Title.[2] At the time of registration, the boundaries of the land were fixed, with the approval of the state surveyor, by decree of the land court.[3] And in accordance with the then established practice, the location of high water mark was fixed along the seaweed line;[4] that is, the growth of seaweed along the seashore. The judgment (Decree of Registration) of the land court was a decree in rem, binding upon the land, upon the state and upon all the world.[5]

In a pre-trial memorandum, the County argued that erosion had reduced the size of Lot 3 from 5.314 acres to 4.201 acres (Ex. P1, Doc. 8). In response, the Owners asserted, *inter alia*, that the original certificate of title issued by the land court was conclusive as to the boundaries and size of

Lot 3, and that there had been no erosion (Ex. P1, Docs. 9 and 10).

At trial, only passing mention of erosion was made in the testimony and no evidence as to any measurement of it was introduced. The presiding judge, however, did take a few minutes to visit the property (Ex. P1, Doc. 20, pp. 161–2), and in his findings of fact, he found that erosion had occurred (Ex. P1, Doc. 11, paragraph 6). In determining the extent of erosion, the trial court adopted a criterion for locating the seaward boundary of unregistered land that had been suggested earlier by the Hawaii Supreme Court in a recent case; that is, the upper reaches of the wash of the waves as evidenced by the line of debris on the shore. *In re Application of Ashford*, 50 Haw. 314, 440 P.2d 76 (1968) (hereinafter *Ashford* ).[6] This line was employed by the trial court in separating Lot 3 into two parcels for valuation purposes.[7]

This separation was only for purposes of assessing the compensation to be paid the Owners for the taking of the whole of Lot 3. The trial court did not rule that the Owners no longer had title to the eroded portion nor did it relocate the seaward

---

2. See notation of Registrar of the Land Court on Map 1, Ex. S1. The Torrens title system of the state is under the judicial supervision of the land court. The land court has exclusive original jurisdiction of all applications for registration of title to land and all questions under the statutes governing registered land. Haw.Rev. Stat. § 501–1 (Ex. P41). A decree of registration conclusively quiets title, subject only to certain statutory exceptions not applicable here. Haw.Rev.Stat. §§ 501–71 and 501–82 (Ex. P41). The certificate of registration, which must include a description of the land, is conclusive evidence of all it contains. Haw. Rev.Stat. §§ 501–74, 501–75 and 501–88 (Ex. P41). *Land Title, Bishop Trust*, 35 Haw. 816 (1941); *Akagi v. Oshita*, 33 Haw. 343 (1935); *In re Rosenbledt*, 24 Haw. 298 (1918), modified on other grounds, 25 Haw. 561 (1920); *Paahao v. Swinton*, 20 Haw. 355 (1911).

3. See notation on Map 1 (Ex. S1), and Haw. Rev.Stat. §§ 501–28, 501–45 and 501–51 (Ex. P41).

4. Ex. P1, Doc. 20, pp. 126, 127, 144; *In re Application of Ashford*, 50 Haw. 314, 317 n. 4, 440 P.2d 76.

5. Haw.Rev.Stat. §§ 501–1 and 501–71 (Ex. P41). As to land registered while Hawaii was a territory, even the United States is bound. *United States v. Fullard-Leo*, 156 F.2d 756 (9th Cir. 1946), aff'd, 331 U.S. 256, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947).

6. This line, called "County Highwater Line" on Defendants' Exhibit 3 at the trial (Ex. P1, Doc. 34) was inland from the Owners' seaward boundary, called "Ld. Ct. Highwater Line" on that exhibit. That exhibit also shows the vegetation line, hereinafter mentioned, inland from both other lines. A photocopy of Defendants' Exhibit 3 at the trial formed the basis for Exhibit P42 herein. Except for minor variations in scale, and coloring of the lines, the two exhibits are identical.

7. Ex. P1, Doc. 11, Findings of Fact Nos. 6, 7 and 8. The absence of testimony or other evidence of the extent of actual erosion to Lot 3 is underscored by the curious circumstance that the metes and bounds surveys used by the trial court to establish separate parcels for valuation purposes, Exhibits 1 and 2 to the Findings of Fact (Ex. P1, Doc. 11), were not identified or introduced in evidence at the trial and are dated about three and four weeks, respectively, subsequent to the conclusion of the trial.

boundary of Lot 3.[8] The judgment simply decreed the taking of "all of Lot 3, Land Court Application 1814 . . ., 5.314 acres" (Ex. P1, Doc. 12, paragraph 2) and awarded compensation for the entire lot. The award included $1.00 for the entire portion of Lot 3 seaward of the debris line and $1.20 per square foot for that portion inland from the debris line, for a total exceeding $200,000.

On appeal to the Hawaii Supreme Court, the Owners claimed that the lower court erred in the assessment of compensation. More specifically, they complained that (1) the seaward boundary had been conclusively fixed by the land court judgment, (2) the *Ashford* case had no application to registered land, (3) division of Lot 3 into two parcels for valuation purposes was improper, and (4) the trial court erred in refusing to consider conjunctive use of Lot 3 with nearby land owned by the Owners.

The Hawaii Supreme Court approved the trial court's use of the *Ashford* decision to define the seaward limit of the land, following erosion, for which the Owners should be compensated. However, the Court's decision went far beyond the judgment of the trial court. It held that the Owners had lost title to a portion of Lot 3 by erosion and that the seaward boundary should be established at the vegetation line. Thus, the Owners were not entitled to compensation for the land seaward of that line. Accordingly, the trial court should, on remand, establish the precise location of the vegetation line and reduce the compensation payable to the Owners.[9]

By this ruling, it was decided for the first time in Hawaii that title to registered land could be lost by erosion.[10] The Owners do not dispute that aspect of the ruling as they concede that loss of title through erosion by natural forces is to be expected. They do complain, however, about that portion of the ruling that mandates use of the vegetation line as the monument locating their seaward boundary following erosion and disregards the original monument that governed the location of the seaward boundary in the judgment registering their title. Such a decision, they claim, deprives them of land through changing the monument by which the location of high water mark is determined.

The testimony at trial established that the debris line used by the trial court to divide the property was approximately 27 feet inland from the seaweed line. The vegetation line, however, was found to be approximately 43 feet inland from the seaweed line.[11] The coastline of Lot 3 is composed of very hard *pahoehoe* lava, overlaid to some extent with a layer of loose material, varying in size from grains of sand to large boulders. The testimony proved that this shoreline could not have been eroded by natural forces to more than three feet inland in the nearly 20 years since it was first surveyed and marked for registration in the land court.[12] The area of Lot 3 lying between the debris line and the vegetation line, for which the trial court had awarded compensation at $1.20 per square foot, was 31,600 square feet. Hence, the redefinition by the Hawaii Supreme Court of high water mark deprived the landowner of property having a value of $37,920 when based on the debris line as the proper seaward boundary.[13]

---

8. In the descriptions of survey, the inland boundary of the more seaward of the two parcels (called Lot 3B) was described as "along the seashore in all its winding along high water (wash) mark" and the seaward boundary was described as being "along seashore" (Ex. P1, Doc. 11, Exs. 1 and 2). Testimony in this court established that the seaward boundary (of Lot 3B) called for the same fixed points and described essentially the same line as the seaward boundary of Lot 3.

9. *County of Hawaii v. Sotomura*, 55 Haw. 176, 517 P.2d 57 (1973) (hereinafter cited as *Sotomura*).

10. See *In re Application of Castle*, 54 Haw. 276, 280, 506 P.2d 1 (1973).

11. This was the situation at the time of trial in November 1971. These distances were scaled from a map (Ex. P42, made from Defendants' Exhibit 3 at trial), based on a survey made in October 1971 (Ex. P1, Doc. 20, p. 141).

12. Ex. S1 shows that the survey of the seaward boundary of Lot 3 was made in the period August 1959 to August 1960.

13. In addition, the Owners lost the $1.00 awarded by the trial court for the land lying

This Court has reviewed the record in the trial court (Ex. P1, Docs. 1 to 35) and the record in the Hawaii Supreme Court (Ex. P2, Docs. 36 to 48) and concludes that the Owners were deprived of procedural due process by the Hawaii Supreme Court. On appeal, the Owners challenged the legal validity of any deduction for erosion (in view of the fact that this was registered land and the lack of evidence of the extent of actual erosion), the use of the debris line as the measure of the extent of erosion, and the failure of the trial judge to give credence to the effect on value of the Owners' ability to use this land as part of a larger parcel. The County defended the trial court's methodology and conclusions. It did not assert, however, that the State was, or that the Owners were not, the owners of any part of Lot 3, nor did it complain that the Owners were not entitled to any compensation for the portion of Lot 3 seaward of the debris line. The appeal was therefore concerned only with value and whether it had been properly determined.

Surprisingly, the appellate court decided the case upon the basis of ownership, determined according to a rule and presumption inconsistent with the legal assumptions upon which the parties and the trial court had proceeded. In their petition for rehearing in the Hawaii Supreme Court, the Owners specifically contended that the redefinition of high water mark effected a taking of their property without just compensation in violation of the Fifth and Fourteenth Amendments to the Constitution, and that they were denied their constitutional right to a hearing and presentation of evidence regarding that taking. The petition was denied without argument, evidence or opinion, with one justice dissenting (Ex. P2, Doc. 42). An attempt to obtain review by the Supreme Court of the United States was unsuccessful (Ex. P36).

■ Judicial transfers of title to private lands to the State which do not permit

the owner an opportunity to be heard or to present evidence is not constitutionally valid. Whenever a party is to be deprived of property, he is entitled to a meaningful hearing *before* the fact. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). *Fuentes* restated the basic reasons underlying the requirement of procedural due process:

> [W]hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property can be prevented. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights . . . ." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170–172 [71 S.Ct. 624, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring).

407 U.S. at 81, 92 S.Ct. at 1994.

*Cf. North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ The Hawaii Supreme Court, without any claim to the land having been asserted by the State or County, nor any hearing on title, *sua sponte* decreed that all of the Owners' property seaward of the vegetation line belonged to the public. Just as in the recently-decided landmark case of *Robinson v. Ariyoshi*, 441 F.Supp. 559, 580 (D.C.Haw. 1977), "plaintiffs have been deprived of property rights without ever having had a fair and meaningful opportunity to defend against their [property rights] being handed over to the State on a silver platter . . . ." The State's right to be heard upon a possible claim to title by erosion of registered land was protected by the Hawaii Supreme

---

between the debris line and the registered high water mark. The debris line did not locate the inland reach of actual erosion, but this Court cannot determine the location of that line as only constitutional questions are before it. In any event, that fact is now impossible to as-

certain, as nature has intervened with a classic occurrence of avulsion. In November 1975, an earthquake caused the southeast coast of the Island of Hawaii to drop varying distances into the sea. Lot 3 and nearby land sank nearly two feet.

Court in *In re Application of Castle*, 54 Haw. 276, 506 P.2d 1 (1973). Surely the owner of the land has no less right than an adverse claimant to be heard.

The failure of the Hawaii Supreme Court to give the Owners a meaningful hearing before relocating their boundary inland affords adequate ground for granting the injunction requested by the Owners.

There is an additional reason for granting the relief requested. That is, the Owners were also denied substantive due process by the Hawaii Supreme Court.

The evidence leaves no doubt that the seaweed or *limu* [14] line was the monument used in locating, on the ground, the high water mark by which Lot 3 was bounded by the sea. This line was at an elevation just above mean high tide and was well defined by the growth of seaweed on the rocks within the reach of the waves (Ex. P1, Doc. 20, pp. 144–145). At the time title to the land was registered in the land court, the State and County claimed ownership of a road through the land and obtained an agreement from the owner to convey it. Neither government, however, disputed the location of high water mark as determined by the owner (Ex. P40a through e). Points along high water mark were marked with spikes set in concrete (Ex. P1, Doc. 20, pp. 128–130) which were still in place at the time of trial of the eminent domain action (Ex. P1, Doc. 20, pp. 136, 137, 148, 154, 161, 162). Some were still visible when geologist Dr. Gordon MacDonald visited Lot 3 in March 1976. The state surveyor re-surveyed the property and made some minor corrections, none of which, though, affected the seaward boundary (Ex. P40b, f and h). As corrected, the map and survey description of the property were approved (Ex. P40g and Ex. S1) and title thereto was registered by judgment of the land court in 1962.

Locating the high water mark by using the seaweed line was consistent with ac-cepted practice at the time [15] and consistent with instructions to the State (formerly Territorial) Surveyor contained in formal opinions of the State (formerly Territorial) Attorney General. These instructions were that high water mark was to be located, consistent with the common law, by reference to the tides and, more specifically, at or near the level of the average of all of the high tides. [16]

At the time the Hawaii Supreme Court announced its decision in *Sotomura*, all relevant precedent except *Ashford, supra*, hereinbelow discussed, demonstrated that high water mark was to be determined by reference to the tides and that mean high water—that is, the average elevation of all of the high tides over a long period of time—was the accepted criterion. The relevant precedent included rulings of the land court in cases of both initial registration and registration of accretion to already registered property [17] and the Hawaii Supreme Court's implicit acceptance of that elevation, known to be approximately 0.8 feet above mean sea level in this jurisdiction, in *Klausmeyer v. Makaha V. F., Ltd., et als.*, 41 Haw. 287 (1956). It also included the Attorney General's opinions previously mentioned as well as earlier opinions referring to "mean high water mark" as an ownership and jurisdictional limit along the shore. [18] The Hawaii Legislature itself recognized as early as 1928, and continued to recognize as late as 1964, that "mean high water mark" is the line of division between private and public property along Waikiki Beach. [19] For many years, the Legislature was aware that public land beneath "tidal waters" abutted private owners on the upland. [20]

The use of mean high water, or the seaweed line as its substantial equivalent, to locate high water mark on the ground was also in conformance with the common law, adopted by § 1–1, Hawaii Revised Statutes,

14. "Limu" is the Hawaiian word for seaweed.

15. Note 4, *supra*; Ex. P1, Doc. 20, pp. 13, 127, 144.

16. Opinions issued in 1932 (Ex. P19), 1936 (Ex. P20) and 1958 (Ex. P21).

17. Exs. P23, P24 and P25.

18. Exs. P16 and P17.

19. Exs. P31, P32 and P33.

20. Ex. P39.

as the law of Hawaii. The common law defined high water mark by reference to the elevations of the tides, disregarding the effect of wind and waves. While there were differences of opinion as to which of the various high tides fixed the high water mark, it was the tides, and not other criteria, which at common law determined the location of high water mark. Many cases expressly rejected physical marks made by the waters on the shore and the extent of the run or reach of the waves on the shore. *Borax Consolidated v. City of Los Angeles*, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935); *United States v. State of Washington*, 294 F.2d 830 (9th Cir.1961); *Eichelberger v. Mills Land & Water Co.*, 9 Cal.App. 628, 100 P. 117 (1908).

Although the decision in *Ashford* may have announced a new rule of law for locating the seaward boundaries of all privately-owned shorefront land in the State, it did not expressly include the seaward boundaries of land registered in land court proceedings to which the State effectively acted as an insurer of title.[21] Despite the strong language of the dissent concerning the potential impact of the case,[22] the majority simply held that the trial court erred in rejecting reputation evidence and relying solely on expert testimony in ruling that the owner's boundary "along the sea" was at mean high water. The case was remanded for further proceedings consistent with the opinion. While the majority did feel that the words "ma ke kai" (along the sea), used in the Royal Patents to the owners' predecessors in title, meant "along the up-

per reaches of the wash of waves, usually evidenced by the edge of vegetation or by the line of debris left by the wash of waves,"[23] that statement must be considered to have been dictum. It was based on testimony which was excluded from the case, although perpetuated in the record as an offer of proof.[24] The offer of proof, of course, was not subject to cross-examination or rebuttal evidence and, in fact, would not have altered the trial court's decision.[25] An appellate court cannot announce law, or rule on property rights, on the basis of evidence excluded by the trial court.

The question then arises as to what justification, if any, there was for the Supreme Court's action. As noted above, the reputation evidence offered in *Ashford* related to unregistered land on an island different from the one herein involved and was not admitted against the adverse party. Here, no evidence of reputation or of the common practice involved in relocating seaward boundaries after erosion was offered at the eminent domain trial. Notwithstanding the lack of any foundation in *Ashford* or the trial record, the Court nevertheless announced that *Ashford* constituted "judicial recognition of long-standing public use of Hawaii's beaches to an easily recognizable boundary that has ripened into a customary right."[26] This was based upon the Court's reliance upon an Oregon case[27] and its own interpretation of the doctrine of custom as authority. However, unlike the situation in the Oregon case, no evidence was offered here in either the State trial court or this

21. Ex. P41, Haw.Rev.Stat. §§ 501–212 to 501–217.

22. Dissenting Justice Marumoto later joined the majority in denying amici curiae petitions for rehearing, stating he understood the Court's position to be that the decision was limited to the facts and not intended to establish a general principle (Ex. P29).

23. 50 Haw. at 315, 440 P.2d at 77.

24. 50 Haw. at 315, 440 P.2d 76 and Ex. P26, p. 9.

25. The Decision of the Land Court stated (Ex. P26, at p. 9):

"This Court has carefully considered the witnesses' answers to the questions and states that the result reached herein would not be altered even if that evidence were admissible." There is no indication as to why the trial court reached this conclusion, but it was certainly for the trier of the fact, and not an appellate court, *inter alia*, to consider the credibility of the witnesses and whether or not their testimony was worthy of belief.

26. 55 Haw. at 181–2, 517 P.2d at 61.

27. *State ex rel. Thornton v. Hay*, 254 Or. 584, 462 P.2d 671 (1969).

480

Court that Lot 3 was ever publicly used. Even had there been, the Owners were entitled to protection against adverse or prescriptive use by the express provisions of § 501-87, Hawaii Revised Statutes. Nor was any evidence offered to establish customary right. To the contrary, evidence introduced in this Court with respect to Waikiki Beach, Hawaii's most widely-known and heavily-used beach, belies the existence of any such right.

As early as 1901, both the government surveyor and the last queen of the Hawaiian monarchy had residences at Waikiki Beach with walls across their seaward frontages that were in the ocean, blocking public passage along the beach. Another Waikiki residence and the Moana Hotel also had portions of their structures similarly situated in the water. By 1928, as an examination of the Waikiki Beach Reclamation Agreement shows, such walls were common along Waikiki Beach. They delineated the seaward boundaries of the abutting upland "along high water mark." [28]

Evidence was introduced by the Owners in this Court to show that original grants of title by the government were not limited to dry upland, above the highest wash of the waves, but in some cases extended to low water mark, or to rocks in the sea constituting the termini of lateral boundaries and, in at least one instance, included submerged reef land. There was also expert testimony from a title abstractor with 50 years experience that the monuments "sea," "seashore," "high water mark," "low water mark," "sea at high tide," "sea at low tide," "sea at very low tide" or equivalent expressions in the Hawaiian language were used to describe seaward boundaries, in both original title documents and subsequent conveyances. The same witness testified that monuments such as "debris line," "edge of vegetation" and "highest wash of the waves" were not to be found in these documents. No evidence or claim to the contrary has been offered or asserted in this case.

The Hawaii Supreme Court's opinion in *Sotomura* does not indicate any legal basis for the presumption that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of vegetation growth when such a line occurs inland from a debris line marking the wash of the waves. The only basis for the presumption is the Court's statement that "the vegetation line is a more permanent monument, its growth limited by the year's highest wash of the waves." [29] No evidence of a legal or factual nature supporting the presumption was offered either in the State trial court or in this Court. On the other hand, the Owners did establish that there was no necessary relationship between the year's highest wash of the waves along Hawaiian shores and the limit of vegetation growth along those shores. An eminent botanist testified to a variety of factors, including inundation by salt water, affecting the rate and location of plant growth on those shores. He expressed the opinion that the seaward limit of vegetation growth is not necessarily controlled by the upper reaches of the wash of the waves, although the climatic, soil and other factors in the general region of Lot 3 are such that the limit of vegetation there could be quite close to the high tide line.[30]

This Court fails to find any legal, historical, factual or other precedent or basis for the conclusions of the Hawaii Supreme Court that, following erosion, the monument by which the seaward boundary of seashore land in Hawaii is to be fixed is the upper reaches of the wash of the waves. To the contrary, the evidence introduced in this case firmly establishes that the common law, followed by both legal precedent and historical practice, fixes the high water mark and seaward boundaries with reference to the tides, as opposed to the run or reach of waves on the shore. For example, on the Island of Hawaii, the seaweed line

28. See Exhibit A to Ex. P31.

29. 55 Haw. at 182, 517 P.2d at 62.

30. The botanist, Dr. Harold St. John, identified several kinds of vegetation that are neither seaweed nor kelp that will grow in the sea, including mangrove and two flowering plants.

was used to indicate the level of the high tides and high water mark. The decision in *Sotomura* was contrary to established practice, history and precedent and, apparently, was intended to implement the court's conclusion that public policy favors extension of public use and ownership of the shoreline. A desire to promote public policy, however, does not constitute justification for a state taking private property without compensation. The Fourteenth Amendment to the Constitution forbids it. *Chicago, Burlington and Quincy Railroad Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *Robinson v. Ariyoshi, supra.*

■ The situation here is similar to one occurring several years ago in the State of Washington. Through a new construction of the state constitution, the Washington Supreme Court had ruled that title to accretion upon oceanfront land vested in the state rather than in the abutting landowner. This thus deprived the abutting owner of a substantial amount of beachfront property to which she held title under pre-existing state law. On appeal to the United States Supreme Court, the Court reversed the state court's ruling, finding that federal law, and not state law, was controlling. *Hughes v. Washington,* 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967). In a concurring opinion, Mr. Justice Stewart asserted that if state law applied, the decision effected an unconstitutional taking. Commenting upon the abrupt change in state law, not foreshadowed by, and unpredictable in view of, existing precedent, Mr. Justice Stewart wrote:

> There can be little doubt about the impact of that change upon Mrs. Hughes: The beach she had every reason to regard as hers was declared by the state court to be in the public domain. . . . Although the State in this case made no attempt to take the accreted lands by eminent domain, it achieved the same result by effecting a retroactive transformation of private into public property— without paying for the privilege of doing so. Because the Due Process Clause of the Fourteenth Amendment forbids such

confiscation by a State, no less through its courts than through its legislature, and no less when a taking is unintended than when it is deliberate, I join in reversing the judgment.

389 U.S. at 297–98, 88 S.Ct. at 443.

This language was later cited with approval in *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973). Although *Bonelli* was subsequently overruled, and *Hughes* limited, by *Oregon v. Corvalis Sand and Gravel Company,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), the effect of *Oregon* was to give added weight to the *Hughes* opinion of Mr. Justice Stewart (who dissented in *Bonelli* and who was among the majority in *Oregon*). *Oregon* decided that questions regarding the ownership of land which, at the time of the state's admission to the Union, underlaid a navigable river, but which was subsequently exposed, should be decided by state law rather than by federal common law.

In an appropriate case, it now appears that the United States Supreme Court today would probably vote with Mr. Justice Stewart in ruling that a taking of private property through a radical and retroactive change in state law, effected by judicial decision, is an unconstitutional taking. Justices Marshall and White, the dissenters in *Oregon,* might even agree since they stated there:

> *Stare decisis* should be more than a fine sounding phrase. . . . Accordingly, "[a] substantial departure from precedent can only be justified . . . in the light of experience with the application of the rule to be abandoned or in the light of an altered historic environment" [Quoting from *Mitchell v. W. T. Grant Co.,* 416 U.S. 600 at 634–635, 94 S.Ct. 1895, 40 L.Ed.2d 406]. Such admonitions are even more salient where land titles are concerned.

429 U.S. at 394–95, 97 S.Ct. at 599.

The owners also contend that the Hawaii Supreme Court, in failing to give res judicata effect to their Land Court Decree of Registration, has transgressed the due process clause of the United States Constitution.

As previously noted, the Owners concede that registered land is subject to erosion. They complain, however, that the use of the highest wash of the waves as the monument fixing their seaward boundary at high water mark, rather than the seaweed line used by the land court, deprives them of property by novel decree. Use of a monument other than the seaweed line would not necessarily measure the extent of erosion. As was shown from the testimony at trial, since the time of registration the shore could not have eroded the 43 feet found to be the average distance between the seaweed line, as originally located, and the edge of vegetation (said to mark the highest wash of the waves), as located just prior to trial (Ex. P1, Doc. 20, p. 141 and Ex. P42). The change of monuments obviously deprives the Owners of property not taken by the sea.

■ A litigant has a right to rely upon the protection afforded by the doctrine of res judicata except in connection with the exercise of recognized governmental prerogatives. If, for example, the taking of the Owners' property in this instance had been accomplished through the exercise of a navigational servitude, to which even a registered title might be subject, the Owners would then have no cause for complaint. The taking here, however, was accomplished through the implementation of an announced policy to extend public ownership of the shore.

The protection afforded by the doctrine of res judicata includes the land court's identification and use of the seaweed line as the monument fixing the location of high water mark for the seaward boundary of Lot 3. "[A] right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . ." *Southern Pacific Railroad Co. v. United States,* 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Compare *Oklahoma v. Texas,* 256 U.S. 70, 89, 41 S.Ct. 420, 65 L.Ed. 831 (1920), (holding that determination of the Oklahoma and Texas common boundary

in a prior suit was conclusive in future litigation.)

■ Res judicata applies even if a court subsequently adopts a different view of the law. In *United States v. Moser,* 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262 (1924), the Supreme Court of the United States stated that a *"fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." 266 U.S. at 242, 45 S.Ct. at 67.

■ Where the refusal of a state court to apply res judicata results in the direct, actual and irreparable loss of property, that refusal must be said to be so fundamentally unfair as to abridge the Owners' constitutional right to due process of law.

## CONCLUSIONS

1. This Court has jurisdiction of the parties and the subject matter of this case.

2. The claims of the Owners in this action were not litigated and could not have been litigated in the Third Circuit Court, State of Hawaii, or in the Hawaii Supreme Court, absent a granting of the Petition for Rehearing, and are not barred by the doctrine of res judicata. (*Scoggin v. Schrunk,* 522 F.2d 436 (9th Cir. 1975), cited by defendants, is clearly distinguishable.)

3. In directing the use of the vegetation line to locate the seaward boundary of Lot 3, the State of Hawaii, through the Supreme Court of Hawaii, has taken the Owners' property without their having been afforded any notice of the intended action, or any hearing or opportunity to present evidence or argument, or any trial by jury of the issues of fact bearing on the court's ruling, in violation of the rights, privileges and procedures secured to the Owners by the due process clause of the Fourteenth Amendment to the United States Constitution.

4. The Hawaii Supreme Court's retroactive application of the *Ashford* standards to locate the seaward boundary of property at the vegetation line, following erosion, ig-

noring vested property rights and without determining the extent of actual erosion, was so radical a departure from prior state law as to constitute a taking of the Owners' property by the State of Hawaii without just compensation in violation of rights secured to them by the Fourteenth Amendment to the United States Constitution.

5. The State of Hawaii, through the Hawaii Supreme Court, failed to give effect to the Land Court Decree of Registration to Lot 3, binding upon the State, the County of Hawaii, and the Owners under the doctrine of res judicata, thereby depriving the Owners of rights and privileges secured to them by the due process clause of the Fourteenth Amendment to the United States Constitution.

6. The Owners are entitled to and are hereby granted an injunction against all defendants and their agents and successors, permanently restraining them from taking any action with respect to Lot 3 inconsistent with this decision, and from claiming ownership or exercising possession or control of any portion of Lot 3 for which compensation has not been paid in accordance with this decision. The trial court awarded compensation for the taking of Lot 3 above the debris line, which it designated as Lot 3A, on the basis of $1.20 per square foot, for an award of $219,229.20. It further designated the area below the debris line as Lot 3B and awarded a nominal value of $1.00. Had there been no erosion, compensation for the taking of Lot 3 should have been for the entire area as designated by the land court decree in the original application, with the shoreline boundary established by it pursuant to the practice then prevailing, which was at the *limu* or seaweed line, which line was at an elevation just above mean high tide. Since Lot 3 did suffer erosion, the seaward boundary subsequent to the erosion had to be redetermined by the trial court. That court should have used the same method of establishing the seaward boundary, which would have been the *limu* or seaweed line, or even the mean high tide. However, because the trial court followed what it believed to be the mandate of the *Ashford* decision, it found the seaward boundary of Lot 3A to be "the upper reaches of the wash of waves as evidenced by the line of debris" (Ex. P1, Doc. 11, p. 3), and therefore had no occasion to make a finding as to where the *limu* line or the mean high tide actually was. In the absence of such determination, and in view of the fact that Lot 3 has since sank nearly two feet, for the purposes of this case it would be appropriate to accept the debris line as found by the trial court to be the proper seaward boundary of Lot 3 at the time it was condemned by the County of Hawaii. Accordingly, the compensation which must be paid for the taking of Lot 3 shall be in accordance with the judgment of the Third Circuit Court, State of Hawaii, filed January 12, 1972, Civil No. 2260, less nominal damages of $1.00 awarded for Lot 3B.

7. The Owners are entitled to and are hereby granted an injunction against all defendants and their agents and successors, permanently restraining them from taking any action with respect to Lot 3 inconsistent with this decision, and from claiming ownership or exercising possession or control of any portion of Lot 3 for which compensation has not been paid in accordance with this decision.

8. The Owners are awarded their costs incurred in this action.