**Mervin NAPEAHI, individually and on behalf of all those similarly situated, Plaintiff–Appellant,**

v.

**William PATY, in his capacity as Director of the Department of Land and Natural Resources, State of Hawaii, Defendant–Appellee.**

No. 87–1844.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 13, 1988.

Decided Dec. 18, 1990.

Alan T. Murakami and Livia Wang, Native Hawaiian Legal Corp., Honolulu, Hawaii, for plaintiff-appellant.

Edwin P. Watson, Deputy Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendant-appellee.

Before HUG, TANG and KOZINSKI, Circuit Judges.

HUG, Circuit Judge:

This action concerns an alleged breach of trust by the State of Hawaii in the manner in which the state officials defined the shoreline of a parcel of privately owned real property. The state official's certification of the high water mark of the ocean waves along the shoreline of the parcel resulted in including 1.75 acres within the boundary of the privately owned parcel, rather than as submerged land held by the State in trust for the people of Hawaii.

## I.

### Overview

The State of Hawaii, under the act that admitted it to statehood, holds certain lands that were ceded to it by the United States in trust for particular uses and purposes. One of those purposes is "for the betterment of the conditions of native Hawaiians." Mervin Napeahi, in his capacity as a native Hawaiian and a beneficiary of that trust, brought this action for breach of trust against the Director of the Department of Land and Natural Resources for the State of Hawaii in his official capacity. The complaint sought injunctive and declaratory relief.

Napeahi contends that by abandoning to a private landowner approximately 1.75 acres of tidal land, which he claims is ceded trust land, the State of Hawaii has breached the trust. In contrast, the director, who is charged with the administration of the trust, maintains that the disputed area is private property rather than ceded public land. After a six-day trial, the district judge found that the area was private land and entered judgment for the director. The principal issue in this appeal is whether the district judge erred in finding that the director was correct in concluding that the area in contention is private land.

This case varies from the usual Hawaiian shoreline dispute in that it is not a contest between the State and a private landowner of sea coast land as to the seaward boundary. In this case, the State and the landowner agree. Instead, it is a beneficiary of the ceded land trust who contends that the State erred in its determination of the seaward boundary, thus depriving the trust of a parcel of land that should have remained subject to the terms of the trust. The landowner is not a party to this action and has developed the area in question as a part of its hotel complex. Thus, the injunctive and declaratory remedies sought by Napeahi would only affect the State in relation to the beneficiaries of the trust.

## II.

### Historical Background

The boundary dispute that animates this appeal depends, for its resolution, on events that transpired over a hundred years ago. Originally, all Hawaiian land was owned collectively by the people of Hawaii and held in trust for their benefit by the King. However, in the mid-nineteenth century, King Kamehameha III, responding to pressure exerted by foreign residents who sought fee title to land, undertook a dramatic reformation of the traditional system of land tenure. A vast land division, the "Great Mahele," ensued under which the King retained certain lands for his own private use, set aside other lands for the government, and distributed the remaining tracts to private individuals.

The Hawaii Supreme court has thoroughly detailed the history and procedures followed in establishing the title and boundaries of parcels of land after the Great Mahele. *See State By Kobayashi v. Zimring,* 566 P.2d 725, 729–31 (Haw.1977). Briefly, we may summarize this as follows. An award by the King in the Great Mahele, itself, did not transfer title. A recipient was required to apply to the Land Commission to obtain the actual award of the land. Because the number and size of the tracts of land distributed pursuant to the Great Mahele were enormous, "[n]o body of surveyors could have been found in the country or practically could have been brought [t]here, who might have surveyed these large estates within the lifetime of half the grantees." *In re Boundaries of Pulehunui,* 4 Haw. 239, 240 (1879). For this reason, and because from ancient times every portion of land found on the Hawaiian Islands had been given a name, these original transfers from the Land Commission were made in name only without a description of boundaries. After conducting a survey to procure a more precise description of the land that the grant encompassed, application could be made to the Commissioner of Boundaries to obtain a definitive determination of the scope of the award. It was only after the boundaries of the land had been surveyed and defined by the Commissioner of Boundaries that a Royal Patent could be obtained.

After the overthrow of the Kingdom of Hawaii, these Royal Patents were recog-

nized but the Republic of Hawaii assumed title to all lands held by the government and by the King. These properties, which became public lands, included all submerged lands surrounding each island to one marine league seaward (three miles). *See Bishop v. Mahiko*, 35 Haw. 608, 642–45 (1940). Subsequently, the Republic ceded all public lands (including submerged land) to the United States pursuant to the Treaty of Annexation of 1897 and the Joint Resolution of Annexation of 1898, 30 stat. 750. Thereafter, when Hawaii became a State in 1959, these "ceded lands" (except for certain land occupied by the United States Government) were returned to the State of Hawaii to be held in public trust for the people under the Hawaii Admission Act of 1959, Public Law 86–3, 73 Stat. 4. Section 5(f) of the Act provided in pertinent part that

> [t]he lands granted to the State of Hawaii ... together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States.

One of the land transfers that occurred under the Great Mahele was an award by King Kamehameha III to his wife, Queen Kalama, of the ili of Anaehoomalu on the Island of Hawaii. (An ili is an ancient Hawaiian unit of land.) Queen Kalama followed the procedure we outlined above and was ultimately issued both a Certificate of Boundary and a Royal Patent covering the ili of Anaehoomalu grant.

### III.

#### Facts and Procedures

The private property owners involved in this case are successors in interest under Queen Kalama's Royal Patent. The dispute in this case centers around 1.75 acres of tidal land which Napeahi contends is not part of the private parcel of land but, instead, is "ceded land" subject to the terms of public trust under the Hawaii Admission Act.

In 1976, the Department of Land and Natural Resources for the State of Hawaii, pursuant to new regulations requiring shorelines to be certified for zoning and setback purposes, certified the shoreline at Waiulua Bay (where the tidal lands are located) indicating that the disputed tidal pond area was situated seaward of the shoreline. However, in 1984, at the urging of the holders of the Kalama Patent who wished to develop the area, the state agency recertified the shoreline concluding that the disputed tidal pond area fell landward of the coastal boundary. After successfully moving for recertification, the holders of the Kalama Patent applied for and received a dredge and fill permit authorizing development of the tidal lands. The present action originally was brought in an attempt to block blasting and dredging of the tidal pool area, but, after injunctive relief was denied, the property was graded and developed as planned. It is currently being used as part of the Hyatt Waikoloa Beach Resort Hotel.

Originally, the plaintiffs in this action complained of numerous instances of misconduct in the handling of the disputed tidal pond area.[1] However, after their re-

1. The original complaint alleged the following: (1) failure to certify compliance with State Water Quality Standards pursuant to § 401 of the Clean Water Act; (2) violation of EPA–Corps Guidelines for issuance of a section 401 dredge and fill permit; (3) violation of the National Environmental Policy Act; (4) failure to remove illegal fill; (5) violation of the Rivers and Harbors Act; and (6) violation of the Hawaii Constitution, Art. XI, § 9.

quest for injunctive relief was denied, they dropped several counts and added a new count, for the first time alleging that the State's abandonment of the land to private individuals constituted a breach of Hawaii's ceded lands trust.[2] Subsequent settlement negotiations resulted in an agreement to proceed to trial in the matter solely on the breach of trust issue.

After a six-day bench trial, the district judge concluded that the disputed tidal pond area was situated within the private property boundaries of the ili of Anaehoomalu. He found that as of July 7, 1898 (the date the Joint Resolution of Annexation was approved), the tidal lands at issue were private rather than public property and therefore could not have been among the lands ceded by the Republic of Hawaii to the United States. The court reasoned that since the disputed tidal pond area is not ceded land, its use or misuse fails to implicate the public trust provisions of the Hawaii Admission Act. As a final matter, the district judge held that any natural change of the seaward boundary since 1898 that would have made the disputed area submerged land would not have resulted in its being subject to the terms of the ceded land trust. This appeal followed.

### IV.

*Interpretation of Royal Patent No. 7523*

■ Possession of a Royal Patent is conclusive evidence of legally cognizable private title to the Hawaiian land that it describes. *See Zimring,* 566 P.2d at 731. A district court's construction of such a document is reviewed *de novo* by the appellate courts. *See United States v. Pappas,* 814 F.2d 1342, 1343 & n. 2 (9th Cir.1987); *cf. Belcher v. Elliott,* 312 F.2d 245, 247 (6th Cir.1962) (construction of a deed is a "legal question requiring [the] [c]ourt to interpret the meaning of the words . . . contained in the deed"). The underlying factual determinations upon which that construction is

based, in contrast, are reviewed for clear error. *See Pappas,* 814 F.2d at 1343 n. 2.

■ King Kamehameha awarded the ili of Anaehoomalu to his wife, Queen Kalama, during the Great Mahele in 1848. Thereafter, in 1854, the Land Commission awarded her the land in name only. It was not until 1880, over 30 years later, that the land was first surveyed in an attempt to establish a more precise description of its boundaries. The task of surveying the Anaehoomalu grant fell to J.S. Emerson and resulted in the creation of a set of field notes which contains a metes and bounds description of all of the property's boundaries, including the disputed shoreline boundary. Emerson also prepared a map that reproduces pictorially his conclusions regarding the ili's parameters. Interestingly, the map itself contains two written descriptions of the parcel's limits which, while they specifically refer to the land boundaries in terms of metes and bounds, do not describe the shoreline boundary so precisely, stating instead that this borderline can be located "along the ι.:acoast at high water mark."

In 1881, both the field survey notes and the map prepared by Emerson were submitted to the Commissioner of Boundaries for the Island of Hawaii so that a definitive determination of the boundaries of the ili of Anaehoomalu could be made. After considering the notes and map provided by Emerson, and correcting one land boundary in order to resolve a dispute with an adjacent landholder, the Commissioner issued Certificate of Boundary No. 131 covering the Anaehoomalu grant. With the one minor exception mentioned above, this certificate expressly adopts the metes and bounds descriptions of the land boundaries that were generated by Emerson's survey. Rather than specifically endorsing Emerson's metes and bounds description of the shoreline, however, the Certificate of Boundary refers to the parcel's seaward border only in general terms as existing

**2.** Although the parties have not, in this case, raised the issue of standing to enforce the provisions of the Trust, Napeahi, as a native Hawaiian and beneficiary of this public trust, does have standing to enforce its provisions. *See Price v. Akaka,* 915 F.2d 469, 471–72 & n. 2 (9th Cir.1990).

"along the seacoast at high water mark." A Royal Patent covering the ili of Anaehoomalu was issued later that year by the Minister of Interior of the Kingdom of Hawaii to Queen Kalama. It contains a description of the ili's boundaries that is identical to the one found in the earlier Certificate of Boundary.

There was considerable dispute at trial as to whether the certification of the Commissioner and, in turn, the Royal Patent, actually incorporated Emerson's metes and bounds description of the shoreline or whether the patent simply left the seaward boundary to be defined as the high water mark. Although the metes and bounds were not actually incorporated in the wording of certification and the Royal Patent, the map and the description filed with the office are significant evidence that those metes and bounds delineated the high water mark at that time.

The Hawaii Supreme Court noted in *In re Application of Ashford*, 50 Haw. 314, 452, 440 P.2d 76 (1968), that "Hawaii's land laws are unique in that they are based on ancient tradition, custom, practice and usage. The method of locating the seaward boundaries was by reputation evidence from Kamaainas and by the custom and practice of the government's survey office." [3] *Id.* 440 P.2d at 77 (citation omitted). The court noted that it was the practice for the Kamaainas who knew and lived in the area to go on the land with the government surveyors and point out the boundaries. The supreme court held "that according to ancient tradition, custom and usage, the location of a public and private boundary dividing private land and public beaches was along the upper reaches of the waves as represented by the edge of vegetation or the line of debris." *Id.* at 78.

There is ample basis to conclude that the location of the seaward boundary, as reflected in government surveyor Emerson's metes and bounds description, was the high water mark derived in the traditional Hawaiian manner and, therefore, the seaward boundary. Thus, we find no error in the district court's determination that, at the time the public land was ceded by the Republic of Hawaii to the United States in 1898, it did not include the 1.75 acres in contention.

## V.

### *Change in Shoreline*

The determination of the shoreline boundary as it existed in 1898 does not, however, end the inquiry. We must determine whether the State has acquired additional submerged land since 1898, and if so, whether it became part of the ceded land and, thus, subject to the terms of the public trust provisions of the Hawaii Admission Act.

■ The Hawaii Supreme Court has held that the seaward boundary of ocean front property can change through erosion, resulting in the State acquiring title to the newly eroded submerged lands. *County of Hawaii v. Sotomura*, 517 P.2d 57, 61 (1973), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). The court stated that "the precise location of the high water mark on the ground is subject to change and may always be altered by erosion." *Id.* The court held that, when the seaward boundary changes inland by erosion, the State owns and may obtain title to the additional submerged land that results. *Id.*

■ The Royal Patent to the parcel of property here in question described the seaward boundary as located "along the seacoast at high water mark." Under the holding of *Sotomura*, that boundary can change through erosion and result in an addition to the submerged public land. There was conflicting evidence at trial as to whether this had occurred.

A secondary question exists, however. Even assuming that the seaward boundary has changed since 1898, resulting in additional state owned submerged land, does this constitute "ceded" land subject to the

---

**3.** A Kamaaina is generally defined as "a person familiar from childhood with any locality."

*Ashford,* 440 P.2d at 77 n. 2.

trust? The director argues that land which became submerged since 1898 could not be "ceded" land because it was not then part of the public land ceded to the United States, and only this "ceded" land was returned to Hawaii to be held in trust.

The Hawaii Supreme Court dealt with a similar problem in *Zimring*. In that case, the issue was over the title to land that had been newly created on the seashore as a result of a lava flow. The court, after carefully reviewing the history of Hawaiian land law, concluded that this was ceded land subject to the terms of the public trust. 566 P.2d at 739. The district court in the case before us concluded that the *Zimring* case was inapplicable to this case because it involved land created by a lava flow, not submerged land created by erosion. However, the reasoning of the Hawaii Supreme Court in *Zimring* is equally applicable here. The supreme court noted that according to the terms of the Joint Resolution of Annexation, the Republic of Hawaii ceded to the United States

> the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and *all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining.*

*Id.* at 735–36 (emphasis in original). The supreme court held that the property ceded included both choate and inchoate property, noting that Article 15 of the Republic's constitution described the territory of the Republic as including territory that "may hereafter be added to the Republic." *Id.* at 736. The court went on to hold that the Republic voluntarily chose to cede all its property interests and that this included the right to future lava extensions. The court stated:

> Since the right to future lava extensions was conveyed to the United States at the time of annexation, any lava extension thereafter created should be considered to be among the "lands and properties that were ceded to the United States by the Republic of Hawaii under the joint

resolution of annexation." [Admission Act § 5(g)]. Such land passed to the State of Hawaii pursuant to section 5(b) of the Admission Act. The State thus obtained title to the disputed lava extension upon admission in 1959.

*Id.*

There is no reason to distinguish the inchoate property interest in submerged land that could be acquired by the State as the result of erosion from that which could be acquired by a lava extension. Both were inchoate property interests which *Zimring* held to be property that was ceded to the United States and then returned to the State in 1959. Thus, the holdings in *Sotomura* and *Zimring* require us to conclude that if the 1.75 acres became submerged land because of natural erosion after 1898 and before being altered by the actions of the property owner, then that property would be ceded lands subject to the terms of the trust.

■ There was conflicting evidence presented at trial as to whether the 1.75 acres that was included within the privately owned parcel in 1898 later became submerged land through a natural erosion of the seashore. The district judge did not make a factual finding on this issue because he concluded that if the property in question was within the private property boundary in 1898, then it could not become property subject to the terms of the trust thereafter. This conclusion does not accord with the Hawaii Supreme Court's rulings in *Sotomura* and *Zimring*. Thus, we must remand the case to the district court for a finding on whether the acreage in question naturally became submerged land by erosion within the meaning of *Ashford, Sotomura,* and *Zimring* after 1898 and before the physical alteration of the area by the property owners. If it did, then it would have become land subject to the terms of the trust and the land would have been improperly abandoned in violation of the terms of the trust. If not, then it remained private land and there was no breach of trust.

The case is remanded to the district court for the required findings and, based upon those findings, an appropriate judgment on the declaratory and injunctive relief sought by Napeahi.

AFFIRMED in part, and REMANDED.